ZAVALA LAND & WATER CO. v. TOLBERT.†

(Court of Civil Appeals of Texas. Feb. 28, 1914. Rehearing Denied March 28, 1914.)

1. VENUE (§ 32*)—CHANGE OF VENUE—PLEA OF PRIVILEGE—WAIVER.

Where, in an action for fraud inducing plaintiff to purchase certain land, defendant filed a cross-petition seeking affirmative relief, it thereby waived its plea of privilege to be sued in the county of its domicile.

[Ed. Note.—For other cases, see Venue, Cent. Dig. §§ 47–50; Dec. Dig. § 32.*]

2. EVIDENCE (§ 461*)—PAROL EVIDENCE—WRITTEN CONTRACT—EXPLANATION.

Where a written contract for the sale of land provided, "It is agreed to bore on land above-described 10⅜ in. casing, guaranteeing water and draw on [plaintiff] for total cost of well when completed," parol evidence was admissible to show the situation of the parties, to determine whether it was intended by such clause that defendant should guarantee sufficient water to irrigate the land sold.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. §§ 2129–2133; Dec. Dig. § 461.*]

3. WITNESSES (§ 282*)—CROSS-EXAMINATION—LEADING QUESTIONS.

Where a witness is called for plaintiff, defendant may propound leading questions to him though the witness was not examined in chief as to the matter made the subject of the questions.

[Ed. Note.—For other cases, see Witnesses, Cent. Dig. §§ 927, 989; Dec. Dig. § 282.*]

4. EVIDENCE (§ 142*)—FRAUD—DAMAGES—SALES OF SIMILAR LANDS.

In an action for alleged fraud in the sale of land, resulting from defendant's failure to furnish water, evidence for plaintiff that before or at the time of the purchase of the land, plaintiff was negotiating with defendant for the purchase of an additional 40 acres, and that in his original petition he sued for damages because of defendant's refusal to permit him to purchase the additional land, but when the water failed he would not have taken it at any price, was inadmissible.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. §§ 416–423; Dec. Dig. § 142.*]

5. APPEAL AND ERROR (§ 1050*)—RULINGS ON EVIDENCE—PREJUDICE.

In an action for fraud in the sale of land, the admission of evidence by plaintiff that at the time of the purchase he desired to purchase an additional 40 acres, and in his original petition sued for defendant's refusal to permit him to purchase the additional land, but when the water failed he did not want the land at any price, was not ground for reversal of a judgment against defendant.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 1068, 1069, 4153–4157, 4166; Dec. Dig. § 1050.*]

6. FRAUD (§ 57*)—SALE OF LAND—DAMAGES.

Where, in an action for fraud in the sale of land, plaintiff claimed that, by reason of the

failure of the water in a well driven for irrigation, the land was practically worthless, defendant was entitled to prove, as bearing on the issue of damages, on cross-examination of one of plaintiff's witnesses, that witness had sold a 40-acre tract similar to plaintiff's and situated near it, for about $100 per acre.

[Ed. Note.—For other cases, see Fraud, Cent. Dig. § 54; Dec. Dig. § 57.*]

7. TRIAL (§ 191*)—INSTRUCTIONS — ASSUMED FACTS.

In an action for fraud in the sale of land, an instruction that, if at the time plaintiff contracted to buy the land, he informed defendant's agents that he was making a contract with the intention of taking immediate possession and making a crop during 1912, and defendant unreasonably delayed the boring of a well that would produce a supply of water sufficient for irrigation for the purposes for which plaintiff, within defendant's knowledge, purchased the land, and that plaintiff was thereby prevented from making the crop, and was caused to lose time during the year 1912 for himself, his son, and teams, the jury should find for plaintiff the reasonable value of his loss, etc., was erroneous as assuming that defendant by its contract had contracted to bore a well on the land that would produce water sufficient for irrigation, which was a contested issue in the case.

[Ed. Note.—For other cases, see Trial, Cent. Dig. §§ 420-431, 435; Dec. Dig. § 191.*]

8. FRAUD (§ 20*)—MISREPRESENTATIONS.

Where notwithstanding the representations of defendant's agents, made to induce plaintiff to buy land, that sufficient water could be obtained from wells to irrigate the land, such agents refused to guarantee or commit defendant, by the terms of the written contract of sale, to the proposition that a sufficient supply of water could be procured for irrigation purposes, and plaintiff, before he made the contract to purchase, went on the land to investigate, and saw irrigation wells on lands that had been sold to others in the vicinity, etc., the failure of the well installed on plaintiff's land to furnish sufficient water for irrigation, and defendant's inability to produce a well with sufficient water for that purpose, did not constitute actionable fraud.

[Ed. Note.—For other cases, see Fraud, Cent. Dig. §§ 17, 18; Dec. Dig. § 20.*]

Appeal from District Court, Hill County; A. P. Dohoney, Judge.

Action by R. L. Tolbert against the Zavala Land & Water Company. Judgment for plaintiff, and defendant appeals. Reversed and remanded.

Dinsmore, McMahan & Dinsmore, of Greenville, for appellant. Thompson & Thompson, of Greenville, for appellee.

TALBOT, J. The appellee, Tolbert, sued the appellant, Zavala Land & Water Company in the district court of Hunt county, Tex. The original petition appears to have been filed on March 23, 1912. On May 21, 1912, in due order of pleading, the defendant filed its plea of privilege to be sued in Zavala county, where it had its domicile, or in Bexar county, where it was alleged it had an office and agent for the transaction of its business. On February 13, 1913, plaintiff filed an amended petition, in which it is alleged, in substance: That plaintiff resided in Zavala county, Tex.; that on or about the 17th day of January, 1912, and for some time prior thereto, the defendant, among other things, was engaged in promoting and developing a town site known as La Pryor in said Zavala county, that pursuant to this end defendant had platted a large body of land in and around said town into lots and blocks, and through its agents and published literature was offering for sale, and was selling, said lands. That by the contract of sale, declared on in the original petition, defendant was obligated to sink a well upon the land sold, and guaranteed a supply of water therein sufficient for the purposes of irrigation; that the section of the state wherein said land is located is arid, and that the rainfall is wholly insufficient for the purposes of growing the usual crops. That the clause of the contract by which defendant obligated himself to sink said well is as follows: "It is agreed to bore on land above described 10% in. casing, guaranteeing water, and draw on R. L. Tolbert for total cost of well when completed." That this provision in the contract was intended to mean, and did in fact mean, a supply of water from the well to be sunk on said land sufficient in quantity to irrigate the 40 acres of land purchased. That the matter of a water supply sufficient for purposes of irrigation was a material consideration with plaintiff in the purchase of said land, and the value of said land is almost wholly dependent on such supply of water. That defendant failed to deliver deed and abstract of title to plaintiff within the time agreed upon, and did not do so until about March 15, 1912, and failed and refused to sink a well upon the land until about May 15, 1912, and that the well was not of the kind provided for in the contract. That the well which appellant sunk on the land does not afford a supply of water sufficient to irrigate, but is worthless for such use. That at the time said contract was made defendant knew that water sufficient for purposes of irrigation could not be obtained upon said land, and at said time did not intend to supply such well, but of these facts plaintiff was not then informed, and wholly relied upon defendant's representations. In this petition plaintiff claimed damages for loss in value of the 40 acres of land, loss of plaintiff's time, and loss of time by plaintiff's sons, and loss of time for teams, and loss of machinery which the plaintiff purchased to test the well, and loss upon labor employed to test the well, aggregating damages in the sum of $5,900. On February 25, 1913, the defendant filed its original answer, which consisted of general demurrer and special exceptions, a general denial, and special pleas, wherein defendant alleges that it performed its obligations under the contract of sale, and furnished a deed of conveyance and abstract of title within reasonable and proper time, and that plaintiff ac-

cepted a deed and abstract and went upon the land and took possession thereof under the deed, whereby he was estopped from claiming any damages by reason of delay in delivering deed and abstract of title, and alleging that defendant bored upon the said land a better well than the well stipulated in the contract, and that it was plaintiff's duty under the contract to test the well, and that plaintiff had willfully failed to properly test the well. And in connection with this answer, but in a separate count, the defendant, by cross-bill, sought to recover of the plaintiff $635, the alleged stipulated price for digging the well mentioned. By his first supplemental petition plaintiff alleged, among other things, that defendant represented to plaintiff that there was an unfailing supply of water to be had upon the land sold plaintiff, by boring a well thereon amply sufficient for purposes of irrigation for all of the said tract of land, "and in its written contract, and in and through its verbal representations and agreement, it was to furnish a well upon said land of the kind therein mentioned; that the well provided by defendant affords no water sufficient to irrigate any land whatever, and same is wholly worthless for the ·purposes for which same was contracted, or for any other purpose for which same could be used upon said land." On February 25, 1913, defendant's general demurrer and all its special exceptions to plaintiff's petition, except the fifth special exception, were overruled. Its fifth special exception was sustained, and plaintiff filed a trial amendment, making the following allegations: "That at the time said contract was made defendant had subdivided a large tract of land in Zavala county into smaller tracts, and through its said agents was engaged in exploiting, advertising, and selling said land in Hunt county and elsewhere as an irrigation proposition. That in the clause of said contract providing for the boring of a well upon said land, defendant, at the time, place, and under the circumstances surrounding, intended to represent and declare, and in fact did represent and declare, to plaintiff that by sinking a well upon said land of the dimensions stated and to a depth of not more than 200 feet, that water sufficient in quantity would thereby be procured to irrigate all crops that might be grown upon said 40 acres of land, and the defendant bound and obligated itself by said contract to provide such well. Defendant at said time, by oral statements and representations made to plaintiff, and by printed statements, cuts, and pictures placed in plaintiff's hands, did further declare to and covenant with plaintiff to provide for him upon said land a well of the kind mentioned, and that said well would and should furnish water in sufficient quantity to irrigate all crops that might be grown upon said 40 acres of land. That plaintiff relied upon said representations of defendant, and was induced thereby to purchase said land, and but for the same he would not have made the said purchase. That at the time defendant and its said agents knew full well that water sufficient for purposes of irrigation could not be obtained upon said land, but of this plaintiff was wholly ignorant, and trusted and relied upon the said representations of defendant. That in making the payment set out in said contract, and in executing and delivering his said notes to defendant, plaintiff trusted and relied upon said representations of defendant fraudulently and deceitfully made to plaintiff to induce him to make said contract, and to pay the money and execute the notes therein mentioned. That plaintiff at the time had no notice of such fraudulent purposes on the part of defendant, and did not in fact learn of the same for some time thereafter." The case was tried before the court and a jury; the issue raised by defendant's plea of privilege being submitted to the jury in connection with the case on its merits, and the trial resulted in a verdict and judgment denying the plea of privilege, and awarding plaintiff damages in the sum of $2,500. From this judgment defendant appealed.

[1] The right to maintain this suit in Hunt county is predicated upon the seventh subdivision of article 1830 of the statutes, which authorizes a defendant in all cases of fraud to be sued in the county in which the fraud was committed, although his domicile may be in some other county, and the first assignment of error complains that the verdict of the jury finding against appellant on its plea of privilege to be sued in Zavala county, which, according to the undisputed evidence, was its place of domicile, is against the great weight of the evidence, and not supported thereby. • Whether or not this is the correct view of the evidence we need not stop here to inquire. It is sufficient to say that appellant, by the filing and trial of its cross-action seeking affirmative relief, as shown by our statement of the pleadings, waived its plea of privilege to be sued in the county of its domicile. It has been repeatedly held by the appellate courts in this state that the filing of such a cross-action and a trial thereon is equivalent to the institution and trial of a new suit by the defendant against the plaintiff, and constitutes a waiver of a plea asserting the right to be sued in another county. It follows that this assignment, without reference to the state of the evidence bearing upon the issue tendered by the plea of privilege, must be overruled. Kolp v. Shrader, 131 S. W. 860; Thorndale Mercantile Co. v. Evens & Lee, 146 S. W. 1053; E. T. Ramsey & Son v. Cook, 151 S. W. 346; Carver Bros. v. Merrett, 155 S. W. 633; Amarillo Commercial Co. v. Milling & Grain Co., 156 S. W. 1124; Barbian v. Gresham, 156 S. W. 365.

[2] The second assignment of error is that the court erred in overruling defendant's first special exception to that portion of plaintiff's first amended petition which reads thus:

"The defendant was further obligated by said contract to sink a well upon said land, and had guaranteed a supply of water therein sufficient for purposes of irrigation. That the section of the state wherein said land is located is arid, and the rainfall is wholly insufficient for the purpose of growing the usual crops. That the clause in said contract guaranteeing said water was intended to mean, and in fact did mean, a supply of water from the well to be sunk on said land sufficient in quantity to irrigate the 40 acres of land purchased. That the matter of a water supply upon said land sufficient for the purposes of irrigation was a material consideration with plaintiff in the purchase of said land, and the value of said land is almost wholly dependent on such supply of water." The clause in the written contract referred to in that portion of the pleading quoted is as follows: "It is agreed to bore on land above described 10⅜ in. casing, guaranteeing water and draw on R. L. Tolbert for total cost of well when completed." The proposition advanced is that: "When the terms of a written contract are free from ambiguity, and when they are susceptible of a clear and sensible construction, their meaning cannot be varied, enlarged, or restricted without an allegation of mistake or fraud." This proposition unquestionably embodies a correct general rule of law, but it is not, we believe, applicable here. Manifestly the clause of the contract in question was not inserted therein without regard to the quantity or uses to which the water guaranteed was to be put, and in that respect it evidently does not unequivocally and fully express the intention of the parties. In such case parol evidence is admissible to show the situation of the parties and the circumstances under which a written instrument was executed, for the purpose of ascertaining the intentions of the parties and properly construing the writing. In other words, it said that in such a case the court may, by admitting in evidence the extrinsic circumstances under which the writing was made, place itself in the situation of the party who made it, and so judge of the meaning of the words, and of the correct application of the language to the things described. Such evidence is received, not for the purpose of importing into the writing an intention not expressed therein, but simply with the view of elucidating the meaning of the words employed; the duty of the court being to declare the meaning of what is written in the instrument, and not of what was intended to be written. 17 Cyc. pp. 673–675. The language, "guaranteeing water," in the contract under consideration, could only be ascertained, it occurs to us, "from a full history of the circumstances under which it was used, and for this purpose the court was authorized to receive evidence explaining the subject-matter, the surrounding circumstances, the relation of the parties, and the inducing cause which led up to the making of the agreement, and this is especially true under the acts of fraud alleged in plaintiff's petition." In so far, therefore, as the court's action in overruling the special exception is concerned there was no error. In this connection it may be further stated that it does not appear that any objection was urged in the trial court to the admission of the evidence offered in support of the allegations sought to be stricken out by the special demurrer thereto.

[3] The fourth assignment of error is as follows: "The court erred in refusing to permit the defendant to ask plaintiff's witness W. T. West a leading question, and by such leading question to prove by plaintiff's said witness that at the time the contract was made, and while it was being written, and just before the contract was signed by the parties, plaintiff asked defendant's agent Hughes to write in the contract a guaranty of enough water for irrigating purposes, and that the said Hughes at the time refused to guarantee even a bucketful of water, and refused to guarantee any quantity of water under the ground, but said he would guarantee, by sinking a well, that water could be had, and that was as far as he would go, as is fully shown by defendant's bill of exception No. 15." This assignment is well taken and the error therein complained of was prejudicial, we believe, to the defendant. We agree with the contention of appellant that a witness called and placed on the stand by a party to the suit remains, so long as he is testifying, the witness of the party calling him, and the opposite party has a right to propound leading questions to him. This rule is not, it seems, of universal application, but is, we think, supported by the weight of authority. Mr. Elliott, in his work on Evidence, vol. 2, § 51, expresses this view of the matter. He says: "There is a diversity of opinion as to whether, as a general rule, the cross-examining party is prohibited from putting leading questions as to a matter proper for cross-examination, but not specifically inquired of by the party calling him on his examination in chief. The weight of authority is in favor of the right to put leading questions, under the circumstances stated, in jurisdictions in which the cross-examination may inquire into the general subject. It is most desirable that rules of general practice, of so much importance, and of such frequent recurrence, should be as few, simple, and practical as possible, and that distinctions should not be multiplied without good cause. It would be often difficult, in a long and complicated examination, to decide whether a question applies wholly to new matter, or to matter already examined in chief. The general rule is that, on cross-examination, leading questions may be put, and it would not be useful to ingraft upon it a distinction not in general necessary to attain the purposes of justice, in the investigation of the truth of facts, that it would often be difficult

of application, and that all the practical good expected from it may be as effectually attained by the exercise of the discretionary power of the court, where the circumstances are such as to require its interposition." We are aware of no case in this state in which the precise question was passed upon, but we think the rule stated by Mr. Elliott in the above quotation is the better one, and should be adopted and followed in this state.

[4, 5] We are further of the opinion that the court erred in permitting the plaintiff to testify that before or at the time of the purchase of the 40 acres of land involved in this suit, he had been negotiating with the defendant for the purchase of an additional 40 acres, and that in his original petition he sued for damages because of defendant's refusal to permit him to purchase said additional 40 acres of land, but that when the water failed he had no use for the land, and would not have taken it at any price. Whether plaintiff and defendant had at another time been negotiating about the sale and purchase of a tract of land other than the one involved in this suit was immaterial, and should have been excluded. We are inclined to think, however, that the error was not of such a character as would of itself require a reversal of the case.

[6] The ninth assignment of error is that the court erred in refusing to permit the defendant to prove by plaintiff's witness, J. L. Barber, upon cross-examination, that the witness had sold a 40-acre tract of land similar to plaintiff's, and situated near plaintiff's, for about $100 per acre, as is fully shown by defendant's bill of exception No. 11. We are of opinion that the exclusion of this testimony was error, and harmful to appellant. It was material on the issue of damages, if any, sustained by the plaintiff. It appears that plaintiff testified that the land he bought from defendant, without an irrigating well on it, was practically worthless, and it was permissible, in rebuttal of such testimony, for the defendant to show that a similar tract of land near by, without such a well, sold for a large price. While the record discloses that the witness would not have stated that he sold his land for $100 per acre, it does appear by bill of exception that he would have testified that he realized for the land in the "neighborhood of $100 per acre." No ground of objection to the question asked seeking to elicit this testimony was stated at the time of its exclusion, but it is urged in this court that it was properly excluded because "the witness Barber's land and the circumstances surrounding it, as shown by the testimony, were quite dissimilar to that of appellee, etc. We do not agree with this view of the testimony. On the contrary, we think the testimony shows that the land of the witness was sufficiently near to and so similarly situated to defendant's land as to render the excluded testimony admissible.

[7] The court charged the jury, among other things, as follows: "If you believe from the evidence that at the time plaintiff contracted with defendant to buy said land, he informed defendant's agents that he was making said contract with the intention of taking immediate possession and making a crop thereon during the year 1912, and that defendant unreasonably delayed the boring of a well that would produce a supply of water sufficient for irrigation for the purpose for which plaintiff, within the knowledge of defendant, purchased said land, and that plaintiff was thereby prevented from making a crop upon said land, and caused to lose time during the year 1912 for himself, his son, and teams, you will find for plaintiff the reasonable value of the time so lost, if any, for himself, his son, and his teams, stating separately the value of each." This charge is objected to on the grounds that it is upon the weight of the evidence: (1) In that it assumes that the defendant had undertaken to bore a well on the land in controversy that would produce a supply of water sufficient for irrigation purposes; (2) because the evidence was not sufficient to warrant a submission to the jury of the loss of time for plaintiff, his son, and teams. The second ground of objection to the charge is not sustained by the record, but the charge is, we think, subject to the first objection urged. The language, "and that the defendant unreasonably delayed the boring of a well that would produce a supply of water sufficient for irrigation for the purpose for which plaintiff, within the knowledge of defendant, purchased said land," clearly assumes that defendant by his contract with the plaintiff had obligated itself to bore a well on the land sold to plaintiff that would produce a water supply sufficient for irrigation purposes. This was a stoutly contested issue in the case, and the assumption in the charge was highly calculated to prejudice the rights of defendant involved in that issue.

[8] The sixteenth assignment of error and the propositions thereunder are to the effect, among other things, that the court erred in not granting defendant's motion for a new trial, because, the great weight of the evidence, if not the uncontradicted evidence, shows: (1) That the defendant made no false representation to plaintiff which induced him to buy the land in question; (2) that plaintiff, instead of relying on the representations of the defendant, made a personal investigation himself of the lands and personal examinations of the wells upon the same, and relied upon the information thus acquired in buying; (3) that at the time the written contract for the purchase of the land was made plaintiff tried to induce defendant's agents to write in the contract a guaranty of water sufficient for irrigation purposes, and that defendant refused to do so. The evidence shows, among other things, that about the year 1909 defendant acquired title to about 100,000 acres of land in Zavala county, Tex.,

and had about 50,000 acres of the same sectionized and surveyed, and test wells bored at the corners of the sections for the purpose of ascertaining whether water could be found by sinking wells. Defendant also subdivided each section and placed said lands on the market. On the 17th day of January, 1912, a contract was made between the defendant and the plaintiff, whereby the defendant bound itself to sell and convey to plaintiff, and plaintiff bound himself to receive and pay for, 40 acres, a quarter of a quarter of a section of land. After the said contract was reduced to writing, and before it was signed, the defendant's agent, at the instance of plaintiff, wrote into said contract as a part thereof the following: "It is agreed to bore on land above described 10⅜ in. casing, guaranteeing water, and draw on R. L. Tolbert for total cost of well when completed." The contract was signed in behalf of the defendant by E. C. Hughes, its agent and was signed by plaintiff and witnessed by W. H. Parish, who was also an agent of the defendant. At and prior to the time the contract was made the defendant had printed and was circulating as advertising matter a pamphlet purporting to give picture views of its lands in Zavala county and of farms on those lands, and of wells being pumped for irrigation purposes. These printed pamphlets stated in substance that the lands mentioned were irrigable by pumping water from wells; that tracts of land were being irrigated from wells; that sufficient water was being secured, and could be secured, from wells to irrigate the said lands. A copy of the pamphlet above mentioned came into plaintiff's hands before he signed the contract. Defendant's agent, Hughes, prior to the time plaintiff made the contract, stated to plaintiff and to others that there was an abundance of water on this land, that the lands could be irrigated by sinking wells and pumping water; that the lands were being so irrigated. There were, on some of the tracts of land sold out of defendant's tract above mentioned at the time the contract was made, and at the time of the trial, wells from which lands were being irrigated.

Plaintiff R. L. Tolbert testified as follows: "I am pretty well acquainted with the wells on the land close to mine, I know every farm and every well. There were plenty of wells sunk in the locality close to my land that did not furnish sufficient water to irrigate 40 acres, and I only know of one that would furnish enough water to irrigate 40 acres, and that was at the experimental station, what they called the deep well. * * * Outside of that well at the experimental station I do not know of any well on their land, and I do not think there is one that will supply enough water to irrigate 40 acres; they water from 8 to 15 acres, and I have watched them closely. When they talked to me about the land I wanted to see it, if they could show me anything I like to see, anything

that is good, that shows to be good, and this was represented to be good. I like to see anything before I buy it, if it is possible to do so, and before I bought this land I went down and saw it. I cannot say I was on the ground and looked all over it, I was not there very long, only a day and a half. I could look over a whole lot of ground in a day and a half, and we did see considerable ground. I saw a good many of the wells · some of the farms were in cultivation; there were not a lot of them in cultivation, only what I would call a few. I saw the truck growing and some of the land being irrigated; but as, to things growing without irrigation, they did not take us to see any of the land that was not irrigated, but I learned afterwards, after I got down there, that there was some growing without irrigation, not much. I had it in my mind to investigate the land before I bought, and that was why I was investigating down there." Plaintiff further testified: "I can hardly state all the conversation I had with Mr. Hughes and Mr. Parish about the time the contract was made for the purchase of this 40 acres of land. As stated, I went down and looked at the land; they were selling it as an irrigation proposition, and claimed that there was plenty of water on the land. I considered the water proposition and told them so; in fact, I told them that was the only way I would consider it; if they had plenty of water on the land it was all right; otherwise I would not have it at all. That conversation was had on the land, in Greenville, here after I came back, just before I bought the land, and at the time I bought it. I talked with Mr. Hughes and Mr. Parish both about it, with one as much as the other, but perhaps I talked with Mr. Parish a little the most. They guaranteed an inexhaustible supply of water; that it could not be exhausted by any machinery in any way, and at a depth of not more than 200 feet. That statement influenced me in the purchase of the land; I would not have had the land if he had not made it so plain about the water, that was the idea I had; they knew the situation, and I relied upon it, and told them so at the time. I went down there with Mr. Hughes to look at the land. Before I went down there, and after I got back here, Mr. Hughes made representations to me about this land. I did not buy while I was down there. He represented to me, after I came back here from looking at the land, at the 40 acres that they offered to sell me, that there was water for irrigation inexhaustible water. * * * Going back to the 17th day of January, the day the contract was made, there is a stipulation written in the face of the contract. Mr. Hughes put it in there, and it was understood between me and Mr. Parish that they were to furnish me water sufficient for irrigation; that is the reason Mr. Hughes put it in there. He did not put that in the contract, he did not put it in just like

I wanted it done, he would not do it, or he did not. do it. He did not refuse positively to put that in the contract; he said the amount of water you would get in a well would depend upon the machinery; if you put in the proper machinery, the water is inexhaustible, and he said that he could not guarantee any amount of water unless I would guarantee the machinery I would put in. I mentioned at the time the contract was made, and before it was signed, that he put in the contract that they would guarantee me sufficient water for irrigation, and Mr. Hughes said that he could not do it unless I guaranteed the machinery. I did not ask them to guarantee enough water to irrigate the 40 acres. I said I would like the water clause to be a little stronger, and he said he could not put it in unless I guaranteed the machinery. He did not refuse to guarantee the water, he said he could not do it unless I guaranteed the machinery, and I asked him what kind of machinery to use, and he said, like Mr. Vann, the school-teacher was using; that if I put in an outfit like that I would have enough water for 80 acres. I had an option on the 40 acres beyond me, and he said that with that machinery it would furnish an inexhaustible supply of water. That was not written in the contract; of course, I asked him to put it in. I accepted the contract without that being written in, on his statement that he would guarantee sufficient water for irrigation, in connection with the contract. I wanted him to write it in the contract, and he said he could not; the contract will show for itself whether it is in there or not. I signed the contract and paid the money without its being in there. I did not accept the contract without them guaranteeing the water; I looked at their honor and the contract both. Mr. Parish said there was a million and a half behind the company. Of course that statement in the contract that they were to sink a well of certain dimensions, guaranteeing water, was partly a guaranty for the securing of water, and partly I relied on that guaranty. I took it that if they refused to put a water clause in the contract, it would be evidence that they had no water, but their putting in that clause made me feel more like there was a certainty of water."

The evidence bearing upon the propositions contended for by appellant is too voluminous to be quoted in full, and we have not undertaken to do so. A careful reading of all of it has led us to the conclusion that the trial court should have sustained the defendant's motion for a new trial, and that it becomes our duty to reverse and remand the case. The great weight and preponderance of the evidence, if not the undisputed evidence, shows that if the agent or agents of the appellant made any false or fraudulent representations to appellee as to the quantity of water which could be procured from a well on appellee's land, appellee at the time the contract was made, had no right to rely upon such representations, because said agents at the time, and just before said contract was executed, in effect, informed appellee that appellant would not be bound by these representations. As has been seen, appellee himself testified that, notwithstanding the representations made by appellant's agents, and upon which he says he relied, they refused to guarantee or commit the appellant by the terms of the written contract to the proposition that a sufficient supply of water could be procured for irrigation purposes. In Bruner Bros. v. Strong, 61 Tex. 555, it is said: "If a representation be made by one contracting party to another in reference to a matter affecting a contract, and the person to whom it is made be informed that the other will not be bound by such representation, then, if it proves untrue, it is not such misrepresentation as amounts to fraud that will invalidate a contract; for such representation cannot be fraudulent if believed to be true, for the party to whom it is made has no right to rely upon it when the other informs him that he does not intend to be bound by it." See, also, Jackson v. Stockbridge, 29 Tex. 394, 94 Am. Dec. 290; Carson v. Kelley & Sweatt, 57 Tex. 382; Belcher v. Mulhall, 57 Tex. 19. Again, we think the great weight and preponderance of the evidence shows that the representations made by appellant's agents to the appellee in regard to the quantity of water that could be procured from a well on the land were not relied upon by appellee, and did not operate as the inducement of his purchase. His own testimony is to the effect that, before he would make the contract for the purchase he went upon the land for the purpose of investigating the matter, and that he did investigate it; that he saw irrigation wells on appellant's lands in operation; that he saw lands being irrigated and truck growing on them. His testimony, as a whole, notwithstanding statements to the effect that he did rely on the representations made to him and was thereby induced to buy, leads almost irresistibly to the conclusion that he would not rely upon the representations of appellant's agents, but that, before he would bind himself to buy the land, he made a personal investigation and relied upon the knowledge thus acquired and his own judgment in making the purchase. The testimony shows that he was upon the ground and made the first investigation in December, 1911; that he moved upon the land about March 18, 1912, and remained there, with opportunities of knowing the amount of irrigation that was being done, until about the last of April, before he openly raised any question about the quantity of water that could be obtained from the well on his land, or the irrigability of the lands.

Touching the evidence, as it appears in the record sent to this court, we desire to add that, while we hold that the plaintiff's allegations, to the effect that the clause of

the contract guaranteeing water was intended to mean a supply of water from the well to be sunk on plaintiff's land sufficient to irrigate the same was not obnoxious to defendant's special demurrer, yet we believe the evidence was insufficient to sustain said allegations. Appellee's own testimony shows that appellant's agent, who represented it making the contract, refused to stipulate therein that appellant would guarantee a sufficient supply of water for irrigation, and refused to put in the contract a stipulation to that effect, unless appellee would guarantee to put in the well from which the water was to be obtained the proper machinery to secure such results, stating, in effect, that the capacity of the well or the amount of water to be obtained therefrom would depend upon the character of the machinery with which it was operated, which it seems appellee declined to do, and accepted and signed the contract with the provision simply "guaranteeing water." This testimony of the appellee, aside from the positive testimony offered by appellant, shows that the words, "guaranteeing water," were not intended to mean water enough for irrigation. Our conclusion is that the verdict and judgment in this case are against the great preponderance of the evidence, and should be set aside. We are well aware that the general rule in the appellate courts of this state is to leave the verdicts of juries undisturbed where there is any substantial evidence upon which they may be predicated; and they have no right to reverse and render a judgment because the verdict is against the great preponderance of the evidence, but in such case they are authorized to reverse and remand for a new trial. Irving v. Freeman (Sup.) 155 S. W. 931. We believe it would be wrong to sanction and permit the verdict and judgment in this case to stand upon the evidence as it appears in the record before us, and we are unwilling to do so.

The other assignments disclose, we believe, no reversible error, and will be overruled.

For the errors indicated, the judgment of the court below is reversed and the cause remanded.