ROSS v. MOORE.　(No. 8466.)

(Court of Civil Appeals of Texas. Ft. Worth. Dec. 2, 1916. Rehearing Denied Jan. 13, 1917.)

1. EVIDENCE ☞445(1) — ADMISSIBILITY — PAROL EVIDENCE — VARYING WRITINGS — SUBSEQUENT PAROL AGREEMENTS.

The rule excluding parol evidence varying writings does not prevent the introduction of parol evidence of an oral modification of the written contract made subsequent to the execution of the written contract.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. §§ 2052–2054, 2063; Dec. Dig. ☞ 445(1).]

2. CONTRACTS ☞237(2)—EXECUTION—MODIFICATION—CONSIDERATION—SUFFICIENCY.

Where a broker and owner entered into a contract to subdivide and sell lots at a certain price and for a certain commission, the fact that the lands were not being sold as rapidly as desired was a sufficient consideration for an oral modification of the written contract in order to facilitate the sales.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. §§ 1120–1122; Dec. Dig. ☞237(2).]

3. CONTRACTS ☞238(2) — ENFORCEABILITY — DEFINITENESS.

Where a broker and owner had a contract to subdivide and sell lands at a price and for a commission, and the lots did not sell as anticipated, it was competent for the owner to confer a general power upon the broker to make any change in the contract necessary to facilitate the sale of the land.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. §§ 1117, 1123; Dec. Dig. ☞238(2).]

4. APPEAL AND ERROR ☞230—OBJECTIONS IN TRIAL COURT.

Objection to the issues as submitted to the jury and the refusal of special requested issues cannot be considered on appeal when not urged before the trial court prior to submission of the charge, as required by Rev. St. 1911, art. 1971.

[Ed. Note.—For other cases, see Appeal and Error, Dec. Dig. ☞230; Trial, Cent. Dig. § 680.]

5. TRIAL ☞141 — QUESTIONS FOR JURY — UNDISPUTED FACTS.

No necessity exists for submission to the jury of undisputed facts.

[Ed. Note.—For other cases, see Trial, Cent. Dig. § 336; Dec. Dig. ☞141.]

6. APPEAL AND ERROR ☞747(3) — ASSIGNMENT OF CROSS-ERRORS—FILING.

Under rules for district and county courts, No. 101 (159 S. W. xi), a cross-assignment of error not filed in the court below will not be considered.

[Ed. Note.—For other cases, see Appeal and Error, Dec. Dig. ☞747(3).]

Appeal from District Court, Tarrant County; R. B. Young, Judge.

Action by G. W. Moore against D. S. Ross. Judgment for plaintiff in part, and defendant appeals. Affirmed.

A. C. Heath and H. D. Payne, both of Ft. Worth, for appellant. McLean, Scott & McLean and Mays & Mays, all of Ft. Worth, for appellee.

CONNER, C. J. As finally presented in the pleadings and trial, the appellee, G. W. Moore, sought the recovery of damages because of an alleged breach on appellant's part of a written contract as subsequently modified by an oral agreement between the parties. The written contract was attached as an exhibit to the plaintiff's petition, and is as follows:

"The State of Texas, County of Tarrant.

"Know all men by these presents that this agreement entered into by and between D. S. Ross, of the first part, and G. W. Moore, of the second part, witnesseth: That the said D. S. Ross hereby appoints the said G. W. Moore as his agent, to subdivide and advertise and sell all that certain tract or parcel of land situated in Clay county, Tex., and described as follows: Sixty-six acres of the east side of block 27, Parker county school lands, shown by plat of said school lands, and recorded on page 528, Book B, Clay County Deed Records—same being land deeded to D. S. Ross by T. A. Matlock and M. A. Matlock, dated August 14, 1908, and described on page 67 of abstract to said lands, said land to be divided into lots 20 by 30 feet, and lots to be sold for $10 per lot, said appointment to continue till all lots are sold, $2 per lot to be set aside by said G. W. Moore as a sinking fund to drill a well on said land, said well to be the joint property of the tract owners, said D. S. Ross and G. W. Moore to share balance, $8, equally, money to be divided as sales are made and money paid in, said G. W. Moore to bear expense of agents, advertising, plotting, and office expenses, said D. S. Ross to sign all deeds as lots are sold, and pay all notary fees, if lots are sold on payments deeds will be given when lots are paid out.

"[Signed]　D. S. Ross.
　　　　　　　　"G. W. Moore.

"And said Moore agrees to devote his best interest, time, and attention to said business.

"[Signed]　D. S. Ross.
　　　　　　　　"G. W. Moore."

It was alleged, in substance, that pursuant to this contract the tract of land therein described had been divided into 4,808 lots, of which 285 were sold by the plaintiff and paid for by the purchasers in accordance with the terms of the written contract, after which time it was found that the sales were not sufficiently rapid to be satisfactory, whereupon it was mutually agreed that the price of the lots should thereafter be $15, instead of $10, as specified in the written contract, the extra $5 to be used for the purpose of increasing compensation to employed subagents; that yet later, this change not proving entirely satisfactory, it was further mutually agreed that the original written contract should be further so modified as that the lots should be sold for $30 each, of which plaintiff, Moore, was to receive $4, the defendant, Ross, $4, and the remainder devoted to the payment of agents and for the digging of ten wells instead of two wells, as provided in the written contract. It was alleged that under the contract as so modified the plaintiff had sold 707 lots, at which time the defendant Ross wrongfully revoked his agency and sued out a writ of injunction preventing all further sales and preventing payment on the part of purchasers of the said 707 lots. The plaintiff therefore sought to recover his damages in the sum of $4 each for the 707 lots sold and not paid for, and for the sum of $4 each for the remaining lots not sold, aggregating $15,264, or a grand total of $18,092.

The defendant Ross answered by demurrers, a general denial, and specially charged, in substance, that the sales made by the plaintiff under the modifications, as the plaintiff claimed, of the original written contract constituted breaches of the only contract between them, and because of which he had revoked the plaintiff's authority to further act. There were certain other special allegations that need not be noticed in view of the result of the trial.

It was undisputed that the defendant Ross canceled the agency of the plaintiff Moore in October, 1913, and the jury in answer to special issues submitted to them found that Moore had sold in all 992 of the lots, of which 285 had been paid for at the time of the cancellation, leaving 707 lots unpaid for at that time. The jury found that the defendant, Ross, by his actions and conduct prevented the payment for the unpaid lots. The jury further found that D. S. Ross knew of the changes made with reference to the raised price and the number of wells to be dug before he had given written notice of the cancellation, and had also executed deeds and received his pro rata share of money for which the lots were sold after the changes indicated. The jury further found that D. S. Ross authorized the plaintiff to make such change as to price and conditions of sale as plaintiff might deem necessary and

proper to stimulate the sale of the lots. They further found that the plaintiff, by an exercise of such diligence as he had been exercising, could have, with reasonable certainty, sold all of the lots. The jury also found that the plaintiff, Moore, had not failed to account for any of the money collected by him from the sale of the lots.

The plaintiff, Moore, moved the court for judgment for the full amount claimed by him upon the answers of the jury. This motion the court declined to grant, but on such answers entered a judgment in plaintiff's favor for the sum of $2,828, and the defendant, D. S. Ross, has appealed.

Appellant has presented some 45 assignments of error, many of which are objected to by appellee as not in compliance with the rules for briefing. Many of the objections are well taken, but we think their discussion will add nothing to what has already been frequently decided, and will therefore undertake to dispose of appellant's brief in a general way only.

[1, 2] It is undisputed that the written agreement was executed as alleged by the plaintiff. The appellee's evidence was undoubtedly sufficient to support the allegations of his petition relating to the subsequent changes in the written agreement and sufficient, as we think, to support the several findings of the jury. Appellant's principal contention seems to be that it was incompetent to prove the alleged subsequent modifications of the written contract, in the absence of a plea of fraud, accident, or mistake. In volume 3 (Blue Book) of Jones' recent Commentaries on Evidence, the author, after discussing the rule which forbids the alteration of a written contract by parol evidence, further says:

"The general rule under discussion, however, does not prevent the proof of 'the existence of any distinct, subsequent, oral agreement to rescind or modify any such contract, grant, or disposition of property, provided that such agreement is not invalid under the statute of frauds or otherwise.' The general rule does not purport to exclude negotiations respecting written contracts, unless they are prior to or contemporaneous with the making of the written instrument, and in a great variety of cases it has been held admissible to prove by parol a subsequent change, modification, addition, or even discharge. For example, it is admissible to show by parol that the written contract has been abandoned except in so far as it has been modified by a new parol agreement; that the time or place of payment or of performance of the contract has been changed; that performance has been prevented or waived by the other party; that the mode of payment for services has been changed. * * *" Section 442, p. 192.

And in 3 Elliott on Contracts, § 1988, that author says:

"Since the parties have the right to modify the contract in any manner they choose, they may, unless prohibited by positive enactment, modify the written contract, even though it be of the most solemn character, by a subsequent valid parol agreement at any time before performance."

These general expressions of the authors named seem to be well supported by numerous authorities cited in notes to the text. Mr. Elliott also notes in section 1989 a conflict in the authorities as to whether any new consideration is needed to support the modification, but in note 69 to that section he cites numerous authorities, including the case of Cooper v. McIlwain, 58 Ala. 296, holding that in general a parol modification of a written contract need not be based upon a new consideration. In the Alabama Case Judge Brickell, C. J., who wrote the opinion, on this subject says:

"There can be no doubt that the parties to a contract may rescind or modify it, at pleasure; and their mutual assent is all that is necessary to support the modification or rescission."

But, whatever may be the better rule, we think there can be but little doubt, under the evidence of this case, that a consideration sufficient to support the modified agreement existed. To illustrate, appellee, Moore, testified on this subject:

"I went to work on the proposition right after this contract was entered into, selling the lots and appointing agents. I put in all of my time on the proposition, and did practically nothing outside of that until they got out the injunction and stopped me. I do not remember the date, but the injunction will show. After the injunction was served on me, I never sold anything else, and I notified all my agents to stop. * * * We changed the price of these lots. * * * The first raise in the lots was to raise them to $15, which was a raise of $5 a lot. That raise was made so that we could pay the agents more. As to the condition of the oil field that I was developing and working in about a month before this suit was filed or the injunction, I will say that the wells were coming in on the land and flowing.

"I talked with Mr. Ross about raising the lots to $15; Mr. Ross came down to the office and said that the proposition was not going fast enough; it was not selling, and I explained to him that I was doing the very best I could, and that I could not make it go any faster, not paying the agents, when other companies— There was two or three different oil propositions on at the same time and they were paying their agents more. That was in that section of the country, up at Electra and across the line in Oklahoma at Tioga and different places. There was two or three oil propositions on the market, and I explained the proposition to Mr. Ross, and he told me to change it any way on earth that I could to make it go. He says, 'You change it any way you see fit to make it go,' he says. He says, 'I will stand by you in anything you do.' I believe there were five men in my office when I had this conversation with Mr. Ross; there was Mr. Hull and Mr. Cochran, and I forget the names of the other men that were in there at the time. With reference to the progress I was making in selling the lots at $10, Mr. Ross said the lots wasn't going fast enough; that the sales wasn't going fast enough. There had been no oil struck right in the immediate vicinity of the Ross property at the time we raised the price to $15. The raise of $5 was to enable us to pay our agents more. I cannot say how long we operated on the basis of selling the lots at $15, but it was for several weeks. The first note listed covering the sale of a lot at $15 is dated September 9, 1913. There was no additional sinking fund created when we raised the price of the lots to $15— No; the date of the raising of the lots to $15 was August 21,

1912. We subsequently raised the price of the lots to $30 a lot. * * * I had a conversation with Mr. Ross regarding the raising of the lots to $30, and he told me to change the proposition any way on earth that I seen fit to make it go. At the time we raised the lots to $15 Mr. Ross told me then to change the proposition any way on earth that I seen fit to make it go. At that time there had been a well drilled on the property was how come we had to raise the sinking fund to drill more wells, and Mr. Ross told me to change the proposition any way I seen fit to make it go, to make the proposition go, and I changed it. That is all that was said about it. The first raise was made in order to pay the agents more, and the raise to $30 was made in order to dig ten wells instead of one well. In the Electra field there was a man had dug one well, and he didn't get anything, and he abandoned it, and it seemed like the people were afraid of one well, and so we raised the price to $30 a lot, and made a sinking fund of $10 a lot, so as to enable us to dig ten wells. People would pay $30 for ten wells quicker than they would pay $10 for one well. Mr. Ross signed deeds to lots sold for $30 after that raise was made. I got my proportion out of the $30 sales just the same as before and Mr. Ross got his. I got $4 a lot. That was my proportion under the contract, and that is what I got. I did not get any more than the $4 a lot unless I went out and made sales myself. Once in a while I helped an agent and he gave me a little out of his commission. That was a matter between the agents and myself; but as between Mr. Ross and myself I did not get any more out of the sale of the lots at $15 or $30 a lot than I did out of a sale at $10 a lot. As I have stated, about a month before this suit was filed, or the injunction, oil wells were coming in and flowing right along there in that field. Conditions were booming there in the field that I was developing and working. They just brought in several flowing wells right on the line, right close to ours. As to the advance in the oil land owned by Mr. Ross at the time this injunction writ was filed as compared with what it was at the time we entered into this contract, I will say that people paid as high as $300 an acre bonus right along within 100 yards of our land when these wells began to flow. That was just before he got out the injunction. At the time I began working on this proposition that same land was worth about $150 an acre. At the time this injunction writ was served lots were selling up there as fast as the agents could get to them."

A fair construction of the above testimony tends to show that both parties to the contract were mutually interested in making the proposition "go." No way has been suggested in which a modification of the contract operated to appellant's prejudice. He continued to receive, as before, the amount specified in the original contract, and we see nothing unreasonable in the desire, as indicated by the testimony, to stimulate the interest and energies of the subagents employed in making sales, and in proffering to purchasers the added inducement of providing ten wells instead of one. The mutual interest thus existing constituted, we think, ample consideration for a modification of the original contract. Indeed, as indicated by some of the testimony and one of the jury's findings, appellant executed deeds and received his pro rata share of the money for which lots were sold under the new agreement.

[3] A consideration of the testimony quoted

we think also a sufficient answer to one of appellant's contentions urged by demurrer, objections to evidence, and in other ways, to the effect that the modified contract was insufficient and unenforceable because of its generality; this contention being predicated upon the allegation and proof on appellee's part that the appellant said, "You change it in any way you see fit to make it go, and I will stand by you." We see no reason why one person may not confer a general power upon another to do or to perform for him any act or thing not unreasonable or of a forbidden character, but, whatever force there may be in appellant's contention to the contrary here, it must be noted from the testimony quoted that the general authority so given by Ross to make a change in the written contract was preceded by conversations in which explanation was made of the necessity or advisability, and contemplated terms of the change.

[4] Numerous objections are presented by assignment to the issues as submitted by the court and to the action of the court in refusing special issues requested. The objections seem not to have been urged before the court prior to the submission of the court's charge to the jury, as required by Revised Statutes, art. 1971, and hence these assignments are subject to appellee's objections. See G., T. & W. Ry. Co. v. Dickey, 187 S. W. 184.

[5] However, it may be said that the questions presented in the objections now urged to the court's general charge are substantially disposed of in what we have already stated, and the issues presented by the special instructions, so far as proper, were sufficiently covered by those submitted by the court. As to the sufficiency of the evidence to sustain the verdict and judgment, it need only be said that no necessity existed for the submission to the jury of undisputed facts. Such undisputed facts must be considered here together with the facts as found by the jury upon the disputed issues, and the whole, in our opinion, undoubtedly sustains the judgment; there being no doubt in our minds of the sufficiency of the evidence to sustain the special findings.

[6] Appellee has presented a cross-assignment complaining of the action of the court in not rendering judgment upon the verdict of the jury for the sum of $18,092, as claimed by him, instead of for the sum of $2,828, but, without considering the questions presented by the assignment, we think it sufficient to say that it will be disregarded because not filed in the court below, as provided in the rules for briefing. See Rules for District and County Courts, No. 101 (159 S. W. xi); Lippincott v. Taylor, 135 S. W. 1070, writ denied; Wilson v. Brown, 145 S. W. 639; League v. Scott, 156 S. W. 1129; Guaranty State Bank v. Hull, 165 S. W. 104.

It is accordingly ordered that the judgment be in all things affirmed.