## MASTERSON v. AMARILLO OIL CO. et al. (No. 2078.)

(Court of Civil Appeals of Texas. Amarillo. March 7, 1923. Rehearing Denied June 6, 1923.)

**1. Mines and minerals ⊙‌⊐78(1)—Financial depression no excuse for nondevelopment pursuant to terms of lease.**

Financial depression throughout the country is no excuse for nondevelopment pursuant to the terms of an oil and gas lease.

**2. Contracts ⊙‌⊐303(1)—Presumed that party will not assume obligation he is unable to perform.**

It is presumed that a party will not assume an obligation which he is not able to perform and whether such inability exists at the time of the execution of the contract or arises subsequently, unless there is a stipulation relieving the party under such circumstances from performance, he is not excused.

**3. Appeal and error ⊙‌⊐1040(13)—Error in overruling exception to matters on which court does not base judgment harmless.**

Where the court does not base its judgment on facts in answer excepted to, error in overruling the exception is harmless.

**4. Mines and minerals ⊙‌⊐78(7)—Subsequently engaging in preliminary organization of company taking over oil and gas lease held not to estop lessor from suing to cancel for breach.**

The fact that lessor was a member of a preliminary association whose activities resulted in acquiring a lease of a large acreage, with the ultimate intention of incorporating and having the company take over all leases, would not ordinarily estop him from maintaining a suit to cancel a lease as an individual, even if pleaded for that purpose, if subsequently the company, as the assignee of the leases, failed to perform the express or implied obligation imposed on the original lessee.

**5. Evidence ⊙‌⊐461(1)—Evidence of plaintiff's participation in organization of company to take over oil and gas lease admissible in suit to cancel.**

In a suit to cancel an oil and gas lease, evidence of the participation of plaintiff in matters leading up to the formation of a company taking over the lease and his acquiescence in his negotiations, looking to the purpose of this organization, was admissible in explanation as part of the surrounding circumstances and extrinsic facts to enable the court to construe the lease in accordance with the intent of the parties, and for the same reason evidence of plaintiff's knowledge of the execution of other leases to be included in such organization, was proper testimony.

**6. Evidence ⊙‌⊐443(1)—Allegation and parol proof that lease sought cancelled part of more comprehensive transaction held permissible.**

In a suit to cancel an oil and gas lease, allegation and parol proof that the lease in question was a part of a more comprehensive transaction whereby it was contemplated that other leases should be secured, and that ultimately a corporation should be organized to take over the total acreage and develop the supposed field in accordance with the direction of the geologist and the best judgment of the corporate officers, was permissible.

**7. Trusts ⊙‌⊐43(1)—Evidence establishing parol trust neither within statute of frauds nor parol evidence rule.**

Evidence to establish a parol trust is neither within the statute of frauds nor the parol evidence rule.

**8. Evidence ⊙‌⊐413—Exception to parol evidence rule permissible when exact justice requires it.**

The purpose of the parol evidence rule is to prevent fraud, but it will not be enforced when to do so would be inequitable, and result in fraud; and verbal agreements, even though they may add to, change, modify, or even abrogate the written contract entirely, are admissible when exact justice would require it.

**9. Mines and minerals ⊙‌⊐78(5)—Plaintiff suing to cancel lease for nonperformance held to have waived strict compliance by participation in plans for future development in connection with other leases.**

Plaintiff suing to cancel an oil and gas lease for nonperformance by subsequently joining with defendants in their plans for future development of the lease in connection with other leases acquired by defendants, with knowledge of the conditions and surrounding circumstances attending their efforts to market the gas produced, must be held to have waived strict compliance either with the express or implied terms governing the production and marketing of gas after the maturity of the lease.

**10. Mines and minerals ⊙‌⊐78(7)—Reasonable time to market gas and exercise reasonable diligence in wildcat territory questions of fact.**

What constitutes a reasonable time in which gas shall be marketed and what amounts to the exercise of reasonable diligence in wildcat territory under all the circumstances are questions of fact.

**11. Mines and minerals ⊙‌⊐78(5)—Lessor by construction or subsequent contract may waive right to forfeit oil and gas lease.**

While time is of the essence of oil and gas leases, and they are to be construed most

―――――

strictly against lessee, and, on an exception to the rule that equity abhors a forfeiture, lessor, by practical construction, by permitting the expenditure of large sums of money in development, and by acceptance of royalties, however small, by his subsequent conduct, and especially by subsequent contract, may waive his right to declare a forfeiture.

**12. Mines and minerals ⊙⇒58, 73—Contracts not construed so strongly against lessee in wildcat territory, and do not require such large considerations to support them.**

Oil and gas contracts are not construed so strongly against lessee in wildcat territory, and do not require payments of such large considerations to support them.

**13. Mines and minerals ⊙⇒78(7)—Finding of reasonable diligence in development of lease sustained.**

Evidence *held* to sustain a finding that lessee had used reasonable diligence in development of the lease, precluding the declaration of a forfeiture by lessor.

**14. Mines and minerals ⊙⇒78(1)—Whether oil and gas produced in paying quantities is for exclusive determination of lessee acting in good faith.**

What amounts to oil and gas in paying quantities is a matter to be determined exclusively by the lessee acting in good faith.

**15. Mines and minerals ⊙⇒78(1)—"In paying quantities," as applied to production of oil and gas under lease, defined.**

As applied to production of oil and gas under a lease, "in paying quantities" means that the quantity discovered must be sufficient to pay lessee a profit, though small, over operating expenses, although it may never repay the cost of the well and its operation, and as a whole may result in a loss to the lessee.

**16. Mines and minerals ⊙⇒77 — Abandonment question of intention, presenting issue of fact, and not of law.**

Abandonment is generally a question of intention and presents an issue of fact, and not of law.

**17. Mines and minerals ⊙⇒58—Failure of lessee to pay original nominal consideration waived by acceptance of subsequent rentals and supplemental lease.**

The failure of lessee to pay the original nominal consideration was waived by lessor's acceptance of subsequent rentals, and by subsequent entry and development of the leases with his knowledge, consent, and acquiescence, and also by the execution of a supplemental lease which was in fact a recognition of the validity of the first.

**18. Mines and minerals ⊙⇒78(7)—Obligation of lessee to drill for oil after discovery of gas in paying quantities held question of fact.**

After the discovery of gas in paying quantity, the further obligation of lessee to drill and prospect for oil, under an oil and gas lease providing for the development of the leased premises, is a question of fact for the court.

**19. Judgment ⊙⇒251(1)—Court without right to adjudicate matter not presented by pleadings.**

A recital in a judgment denying plaintiff's claim for forfeiture and cancellation of an oil and gas lease that it should not be a bar to any future action for damages or specific performance, being an adjudication of a matter not presented by the pleadings, is erroneous.

**20. Mines and minerals ⊙⇒78(1)—Drilling well to production within term held to create interest in land.**

The drilling of a well to production within the term of an oil and gas lease creates at its completion an interest in the land.

**21. Mines and minerals ⊙⇒58—Reasonable diligence in drilling a well to production in wildcat territory held to create a consideration sustaining lease for nominal sum not paid.**

Reasonable diligence under all the circumstances in drilling a well to production in compliance with the conditions as to development in wildcat territory creates a consideration supporting an oil and gas lease for a nominal original consideration in cash not paid.

Appeal from District Court, Potter County; Reese Tatum, Judge.

Suit by R. B. Masterson against the Amarillo Oil Company and others. From a judgment for defendants, plaintiff appeals. Affirmed.

Madden, Trulove, Ryburn & Pipkin, of Amarillo, for appellant.

Hendricks & Mood, Turner & Dooley, and J. W. Crudgington, all of Amarillo, and Jas. F. Getty, of Kansas City, Kan., for appellees.

HALL, C. J. Appellant, Masterson, as plaintiff in the court below, filed this suit to cancel an oil and gas lease and a supplemental lease upon 18,500 acres of land belonging to him, in Potter county. The original lease, executed by R. B. Masterson, as lessor, and M. C. Nobles, as lessee, omitting the immaterial parts, is as follows:

"Witnesseth: That the said lessor, for and in consideration of the sum of ten dollars, cash in hand paid, receipt of which is hereby acknowledged, and of the covenants and agreements hereinafter contained on the part of the lessee, to be paid, kept and performed, has granted, demised, leased and let, and by these presents does grant, demise, lease and let, unto the said lessee, for the sole and only purpose of mining and operating for oil and gas, and laying pipe lines and building tanks, power stations and structures thereon, to produce, save, and take care of said products, all that certain tract of land situated in the county of Potter and state of Texas, described as follows, to wit: [Here follows the description of the land by section, block, and survey numbers.] It is agreed that this lease shall remain in force for a term of three years from this date, and as long thereafter as oil or gas or either of them is produced from said land by the lessee.

---

⊙⇒For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

"In consideration of the premises the lessee covenants and agrees:

"First. To deliver to the credit of the lessor, free of cost in the pipe line to which he may connect his wells, the equal of one-eighth part of all oil produced and saved from the leased premises.

"Second. To pay to lessor one hundred dollars each year in advance, or one-eighth of the gas, at the option of lessor, for the gas from each well, where gas only is found and marketed, while the same is being used off the premises, and lessor to have gas free of cost from any such well for all stoves and all inside lights in the principal dwelling house on said land during the same time, by making his own connections with the well, at his own risk and expense.

"Third. To pay lessor for gas produced from any oil well and used off the premises at rate of $50 per year, for each well, for the time during which such gas shall be used, said payments to be made each three months in advance.

"If no well be commenced on said land or on other land leased by the lessee in this prospective oil field, on or before the 22d day of December, 1917, and finished on or before the 22d day of December, 1918, this lease shall terminate as to both parties unless the lessee on or before six months from said last date shall pay to lessor or to his credit in the National Bank of Commerce at Amarillo, Tex., or its successor, the sum of ten dollars, which bank shall continue as the depository, regardless of change in ownership of said land, which shall operate as a rental and cover the privilege of deferring the commencement of a well for six months from said date. In like manner and upon like payment or tenders the commencement of a well may be further deferred for like periods of the same number of months successively, provided that in no event shall this lease run longer than three years unless gas or oil be found in paying quantities.

"If the estate of either party hereto is assigned and the privilege of assigning in whole or in part is expressly allowed, the covenants hereof shall extend to their heirs, executors, administrators, successors or assigns.

"In testimony whereof we sign this the 22d day of December, 1916."

On the 12th day of September, 1918, Masterson gave the lessee notice that he had elected to take his royalty of one-eighth of the gas produced in lieu of the well rate stipulated. Thereafter M. C. Nobles conveyed to other parties equal undivided interests with him in the lease, and thereafter he and his associates caused the appellee oil company to be organized, and conveyed to it as part of its assets an undivided one-half of the interest evidenced by the contract. No well was commenced upon any part of the land described in the original contract, and on the 3d day of February, 1919, the appellee, through its representatives, requested an extension of the time for drilling for one year from the expiration of the three-year term. This request was granted, and the supplemental contract was entered into, expressly extending the term of the lease from three to four years upon consideration of $1, and upon condition that the oil company should commence a well for oil or gas on or before the 22d day of December, 1919. The supplemental contract provides that in the event of a failure to drill, the company shall pay rental for the one-year extension, the sum of 25 cents per acre, in advance.

The pleadings of the parties are voluminous, and will not be set out except in so far as may be necessary to consider the propositions urged, and especially propositions based upon certain exceptions to the answer of the oil company, which were overruled. The original lessee, M. C. Nobles, has assigned a one-half interest in the lease to the Amarillo Oil Company, the other half being vested in A. R. and Frank E. Jones and E. W. Goebel. The case was tried to the court without a jury. The trial judge filed 41 different findings of fact, which will be hereinafter set out in considering the several propositions attacking such findings, and concluded as a matter of the law that the lease did not lapse at the end of the expiration period of four years, that the appellees had not abandoned the lease, and that it was not subject to forfeiture.

Appellant urges 15 propositions, based upon 180 assignments of error.

The first proposition is that the court erred in each and all of his holdings and rulings to the effect that the defendant had a right to allege, prove, and have considered as a defense to plaintiff's cause of action the various matters set up in their special answer, and in holding that such matters constituted a good and sufficient defense to plaintiff's cause of action, because they are extrinsic matters, and foreign to the contract set up by plaintiff, and to allow the same as a defense is to vary the terms and provisions of such contract by parol, and make for the parties a contract differing from the one in fact entered into. The rulings complained of are specifically stated as follows:

(a) The overruling of each and all of plaintiff's general and special demurrers to defendant's special answers, complained of in assignments 1 to 56, inclusive.

(b) The admission of testimony, over plaintiff's objections, that the same was irrelevant, incompetent, and proof of extraneous facts to vary the written contract in support of and tending to prove the allegations made in such special answers complained of in assignments 59 to 82, inclusive.

(c) The findings of fact in accordance with and sustaining the truth of the extrinsic matter alleged in such special answers complained of in assignments 88 to 139, inclusive.

(d) Refusing to find, at the request of plaintiff, facts supporting and responsive to the issues made by plaintiff's allegations without reference to the extrinsic matters al-

leged in defendant's answers, complained of in assignments 140 to 168, inclusive.

(e) The holdings of such extrinsic facts and transactions as alleged and proven sufficient to constitute a defense of the cause of action as alleged by plaintiff, complained of in assignments 1 to 158, inclusive.

In order to understand the force of these contentions, it is necessary to set out portions of the defendants' answer, which we do in substance as follows:

That about the 13th day of December, 1916, Lee Bivins leased to M. C. Nobles by written contract containing substantially the same stipulations as are contained in the lease in question, and embracing 18,000 acres of land, situated on the south side of and across the Canadian river from the lands described in the contract under consideration. That on the 24th day of April, 1917, on the 1st day of June, 1917, and on the 18th day of February, 1918, respectively, the plaintiff executed and delivered two other contracts to the said Nobles and one to said oil company, leasing for a period of three years about 37,000 acres of land, which subsequent leases were similar in their provisions to the lease in question. That when the lease in question was executed, December 22, 1916, Masterson knew of the prior execution and delivery of the Bivins lease, both leases being under negotiation at the same time. That plaintiff would not execute his lease until after the execution and delivery of the Bivins lease. That in securing such contracts Nobles was acting for himself and 13 other persons, with the purpose of obtaining the lease and prospecting and developing the lands for minerals. That plaintiff knew that fact, and that it was contemplated that a corporation would thereafter be formed to which said leases would be transferred, and that the corporation would continue to carry out the purposes of the prior association, and that Masterson was a member of the preliminary organization. That the defendant oil company was thereafter chartered on the 24th day of April, 1918, with the plaintiff participating in its organization as a promoter, and stockholder to the extent of 70 shares of its capital stock, and that he became an officer and director in the company which had been organized with a capital stock of $10,000. That during the negotiations for the leases plaintiff knew that Nobles and his associates would endeavor to obtain further leases on contiguous property, and that the prospective field would be expanded for the purpose of promotion and development as a solid block of leases. That the territory included in such leases was at that time "wildcat territory," situated about 200 miles from any known field producing either oil or gas. That it was situated about 20 miles from the railroad, with no existing pipe lines or other facilities for marketing oil or gas, and it was contemplated that the process of development and marketing of either of said products would be slow, and dependent upon future conditions, speculative in their nature. Plaintiff further knew that outside money and parties would be required to aid in the promotion and future development.

That thereafter, on the 5th day of November, 1917, the oil company contracted with one Hapgood, transferring a certain portion of its leases in return for the drilling of a test well upon its property, the said Hapgood and the company agreeing to own such well equally; that, while the Hapgood well was being drilled to production, Hapgood required financial assistance from the oil company, and plaintiff participated in the loan for the purpose of completing said well. That said well became a gas producer on December 11, 1918, to the extent of 10,000,-000 cubic feet per day, and thereafter all parties, including plaintiff, contemplated that the field would develop into a gas field. That the capacity of said well was insufficient as a basis for a market, or to attract industrial concerns, or to interest capital in providing marketing facilities, without further development, and it was of no avail except as a matter of further development to establish the field as a gas field, and all parties, including plaintiff, contemplated that future efforts must be along that line. That, after the completion of the Hapgood well, which is known as "Masterson No. 1," the company diligently endeavored to interest others in the territory covered by its various contracts, and finally, on the 7th day of December, 1918, made a tentative contract with one Perry A. Little, by which it was agreed that the oil company should drill two other wells, not closer than half a mile apart and from said Masterson No. 1, in an effort to raise the gas production to not less than 25,000,000 cubic feet daily, in the aggregate, and as a prerequisite for the construction of a pipe line to convey the gas to the city of Amarillo and vicinity, which constituted the only available market for gas at that time. The plaintiff acquiesced and participated in such arrangements, and knew and contemplated with the other interested parties that further efforts would be required to obtain money for additional drilling and development. That the defendant company, in pursuance of such purpose, and to comply with the contract made with Little, contracted with its codefendants, A. R. and Frank E. Jones and E. W. Goebel, on the 20th day of November, 1918, to drill five wells in said field; agreeing to assign to said codefendants in the future a one-half interest in the leased holdings as consideration for such drilling. That under said contract well No. 2, located on section 70, embraced in the lease executed by plaintiff on the 18th

day of January, 1918, well No. 3, located on section 102, embraced in the lease executed by plaintiff on the 24th day of April, 1917, well No. 4, located on section No. 108, embraced in the lease executed on the 1st day of June, 1917, and well No. 5, located on section 31, embraced in the lease which plaintiff seeks to cancel herein, were successively drilled, resulting in large gas production. That during this time Bivins well No. 1 was commenced August 1, 1919, and completed February 22, 1920, with a large gas production, and about the 6th day of April, 1920, the defendants spudded in well No. 5, situated on section 31 of the land covered by the lease in controversy, which well was completed in June, 1920, to a depth of 2,266 feet, and proved to be a gas producer in paying quantities. That before well No. 5 was completed on the lease in question defendants commenced drilling Bivins well No. 2, which was continued to a depth of 3,700 feet, and abandoned on April 21, 1921, as a dry hole.

That the successful development set out induced other persons and corporations to drill in adjoining territory. That after the completion of well No. 3 defendants constructed a pipe line from such well to the drilling site of well No. 5, for fuel purposes, at a cost of about $15,000. From this line connection was made, piping gas to drilling sites for the use of outside parties. That thereafter, about the 15th day of July, 1920, well No. 3 was disconnected from the pipe line, and connection was made with well No. 5, so that gas used for fuel by outside parties in drilling operations was drawn from well No. 5 until about the 24th day of September, 1920; that the owners of said outside wells paid for gas so used by them the sum of $20 per day during said period, aggregating the sum of about $2,395, of which amount plaintiff was paid his part. That up to the time when Bivins well No. 2 was completed defendants had expended about $400,000 in developing the entire field, and had expended about $300,000 in developing that part of the field covered by plaintiff's land, including the Hapgood well. That the defendants procured third parties to construct and complete the pipe line, about 29 miles in length, connecting the gas field with the gas mains in the city limits of Amarillo. That the connection was completed about the 4th day of September, 1920, some of plaintiff's wells being connected with such pipe lines, and ever since gas has been steadily sold and marketed at the rate of 8 cents per 1,000 cubic feet, from which plaintiff, as lessor, has received periodically payments as royalty, to the extent of about $14,000, besides the sum of $800, which plaintiff had previously received as his part of the proceeds of gas sold to outside parties for drilling

purposes. That the only sale of gas from said field is and has been from wells situated on plaintiff's land embraced in the various leases executed by him. That plaintiff and the said Nobles knew and contemplated when the Bivins lease was executed December 13, 1916, and when the plaintiff's lease was executed December 22, 1916, that lands embraced in the Bivins lease would be entitled to development, and he also knew and contemplated that the company would develop and had the right to develop the whole body of leases of which the integral leases were component parts. That over and above a consumption of gas through the pipe line aforesaid there is an excess of gas in said field. That defendants have been diligently endeavoring to procure a market for such excess gas, including the gas of well No. 5 on the lease in controversy. That said oil company contemplated, and had a right to believe, and act in accordance with such belief, that the establishment of a large proven field would result in large industrial users and a further market for said gas, which market is increasing from season to season. That during 1920 and 1921 gas from said well No. 5, situated on the lease in controversy, has been supplied to a dwelling house and a cow camp situated upon property owned by plaintiff and used for domestic purposes as fuel.

[1-3] It is the opinion of a majority of the court that the appellant's exceptions to the appellee's answer, quoted in part above, should have been sustained as against the allegation seeking to excuse nondevelopment on account of financial depression throughout the country. It is presumed that a party will not assume an obligation which he is not able to perform. Whether such inability exists at the time of the execution of the contract or arises subsequently, unless there is a stipulation relieving the party under such circumstances from performance he is not excused. R. E. Taylor Syndicate v. James (Tex. Civ. App.) 243 S. W. 1105; Williston on Contracts, § 1932. The court did not base his judgment upon this fact, and the error in overruling the exception is therefore harmless.

[4, 5] The fact that Masterson was a member of the preliminary association whose activities resulted in acquiring the lease of a large acreage, with the ultimate intention of incorporating and having the company take over all the leases, would not, ordinarily, estop him from maintaining this suit, even if pleaded for that purpose, if subsequently the company, as the assignee of the leases, failed to perform the expressed or implied obligations imposed upon Nobles as the original lessee. The corporation is a distinct entity from its promoters and stockholders, and Masterson's ownership of stock in it would in no degree affect his right to

cancel this lease as an individual, unless in virtue of some action on his part he had wrongfully influenced the company to such an extent as to create a condition entitling him to a forfeiture. However, evidence of his participation in the matters leading up to the formation of the company, and his acquiescence in its negotiations looking to the purpose of its organization, was admissible in explanation as part of the surrounding circumstances and extrinsic facts to enable a court to construe the contract in accordance with the intent of the parties. For the same reason the other leases, including the Bivins lease, and Masterson's knowledge of their execution, and of the purpose appellees had in securing them, was proper testimony. Taylor v. McNutt, 58 Tex. 71; Smith v. Brown, 66 Tex. 543, 1 S. W. 573; Stuart v. Meyer (Tex. Civ. App.) 196 S. W. 615; Barnard & Moran v. Williams (Tex. Civ. App.) 166 S. W. 910.

Myer ·v. Fruin (Tex. Sup.) 16 S. W. 868, is a case involving the performance of a building contract in which a dispute as to how certain work should be done arose. It was held that the builder was entitled to put in evidence another and different plan from that attached to the written contract, and which was shown him at the time the contract was made by the architect, and that he could prove that the architect explained certain variance between the two plans to him, and directed him to do the work in accordance with the detached plan. McKinnon v. Porter (Tex. Civ. App.) 192 S. W. 1112, and Gravity Canal Co. v. Sisk, 43 Tex. Civ. App. 194, 95 S. W. 724, are also cases in which proof of attendant circumstances in contemplation of the parties prior to and at the time of the formation of the written contract were admissible to enable the court to correctly interpret it. The matters pleaded and excepted to were not pleaded to vary or contradict the stipulation in the written lease providing for the completion of a well within four years. The well was drilled and gas in paying quantities discovered within the term, thereby maturing the lease and vesting the leasehold interest. After discovery the implied duty rested upon appellee to use only reasonable diligence under all the circumstances known to both parties in marketing it, and the matters so pleaded had reference to the issue of diligence after discovery, and the right to forfeit for nonproduction. Even if the contract contained a stipulation that gas must be marketed within the four years, the parties could, by mutual consent, subsequently made, extend the period for marketing it if conditions known and understood at the time permitted such action, and the prospective profits to be derived from the development of the whole field and the mutual advantages which would accrue as a result of owner-

253 S.W.—58

ship of a large acreage would be a sufficient consideration. Lone Star Canal Co. v. Broussard (Tex. Civ. App.) 176 S. W. 649; Zavala Land & Water Co. v. Tolbert (Tex. Civ. App.) 165 S. W. 28; American L. & Mtg. Co. v. American Nat. Bank (Tex. Civ. App.) 205 S. W. 146; Bost v. Biggers Bros. (Tex. Civ. App.) 222 S. W. 1112.

"There is a class of cases holding that parol evidence of a collateral contemporaneous agreement, which assumes the contract as indicated by the writing, and undertakes to deal with some contingency or new relation with the parties in the future that may arise under the written agreement, is permissible." 2 Elliott on Contracts, § 1634.

[6-8] Allegation and parol proof that the lease in question was a part of a more comprehensive transaction, whereby it was contemplated that other leases should be secured in addition to this and the Bivins lease, already obtained, and that ultimately a corporation should be organized to take over the total acreage and develop the supposed field, in accordance with the direction of the geologist and the best judgment of the corporate officers, under the circumstances, was permissible. Thomas v. Hammond, 47 Tex. 42. The oral agreement that a company should be organized for this purpose, and proof that the purpose was carried out, had the effect of making the company an active trustee, and it is settled law in this state that evidence to establish a parol trust is neither within the statute of frauds nor the parol evidence rule. Hickernell v. Gregory (Tex. Civ. App.) 224 S. W. 691; Lester v. Hutson (Tex. Civ. App.) 167 S. W. 321. There are many other well-established exceptions to the parol evidence rule. The purpose of the rule is to prevent fraud, but it will not be enforced when to do so would be inequitable and result in fraud, and it has therefore been held that verbal agreements, even though they may add to, change, modify, or even abrogate the written contract entirely, are admissible when exact justice would require it. This exception has been frequently declared by the courts generally, and is as well established as the rule itself in this state. Eubank v. Bostick (Tex. Civ. App.) 194 S. W. 214; Bell v. Self (Tex. Civ. App.) 210 S. W. 304. In Ross v. Moore (Tex. Civ. App.) 191 S. W. 853, Conner, C. J., discussed the effect and extent of the rule in a clear and comprehensive opinion, to which we refer without quotation.

The court found that M. C. Nobles and five other citizens of Amarillo were negotiating with Lee Bivins for an extensive lease at the same time the negotiations with Masterson were in progress; that the two tracts of land were separated only by the channel of the Canadian river, which was about half a mile in width, and but for said river the two tracts of land would have been adjacent;

that at the time of the lease in question Masterson owned about 100,000 acres of land north of the river, and that the structure ran the whole length of Masterson's land; that at the time of the execution of the lease in controversy Masterson knew that Nobles and his associates would endeavor to obtain other leases upon said structure in addition to the Bivins and Masterson leases mentioned above for the purpose of prospecting for oil and gas on said structure, and that Nobles and his associates were endeavoring to get a large body of land, including all of the structure as near in a solid body as practicable, for the purpose of using said land in aiding them to prospect the property, and that Masterson knew of this fact; that Masterson was one of the 14 men engaged in organizing the defendant oil company, and that the purpose of its organization was to prospect for oil and gas on the land leased, and on the structure designated by Gould, the geologist; that at the time of the organization of the corporation and taking over a large body of leases, constituting a part of its assets, it continued to be the purpose of the incorporators to share in said purpose, and to use said leases as an aid in promoting said enterprise, and, in order to use them as a basis to better enable them to secure other men and money to develop said structure, which was a part of the land contained in said leases; that Masterson knew that in wildcat territory a big body of land would have to be obtained to realize development, and that he contemplated, when the lease was executed and the development term extended for one year, that, if a well was drilled to production in paying quantities, and completed with the last day of the lease and of the period of extension, said lessee would have complied with the lease contract up to that date.

The facts pleaded and found by the court affecting the performance of the contract prior to the time Masterson became associated with the defendant, if inadmissible for any other reason, are proper matters for consideration when afterward he became a party to the comprehensive plan for developing the whole field. If it be admitted that the agreement between Nobles and his associates is improper to be considered under the parol evidence rule, we think it is clear that, when he entered into the scheme, then, as to him, it is a subsequent contract, although it may be held, as between the defendants, to be contemporaneous with the execution of the lease in question. At that time, in so far as he was concerned, it was simply an agreement, affecting only the rights of the parties to it. It was not his contract until he entered into it, and this was subsequent in point of time to the execution of his lease.

"The rule forbidding the admission of parol or extrinsic evidence to alter, vary, or contradict a written instrument does not apply so as to prohibit the establishment by parol of an agreement between the parties to a writing entered into subsequent to the time when the written instrument was executed, notwithstanding such agreement may have the effect of adding, changing, modifying, or even altogether abrogating the contract of the parties as evidenced by the writing, for the parol evidence does not in any way deny that the original agreement of the parties was that which the writing purports to express, but merely goes to show that the parties have exercised their right to change or abrogate the same to make a new and independent contract." 22 C. J. p. 1273, § 1693.

[9, 10] It is true that production, with the consequent realization of profits by the lessee, and the receipt of royalties by the lessor, must be held to be the paramount consideration and moving cause in the execution of the contract. The discovery of minerals in such quantity as would pay even a small profit, followed by a cessation of reasonable effort on the part of defendants to market and thereby realize proportionate returns from such discovery, is not compliance with the strict letter of the contract or its spirit. This must be conceded. The effect of the clauses in the original contracts, reciting that the lease shall remain in force after the term of three years, and as long thereafter as oil and gas or either of them is produced from said land by the lessee, and the further provision written into the printed form "that in no event shall this lease run longer than three years unless gas or oil be found in paying quantities," when construed together aside from the surrounding circumstances, and without reference to the matters set up in the answer above, to which Masterson became a party by subsequent agreement, is to require the marketing of gas from well No. 5 and the payment to Masterson of the stipulated royalty, subject, of course, to the limitation imposed by the rule which gives defendants a reasonable time under the circumstances to do so. By subsequently joining with defendants in their plans for future development, with knowledge of the conditions and surrounding circumstances attending their efforts to market the gas, he must be held by such subsequent agreement to have waived strict compliance with either the expressed or implied terms governing the production and marketing of gas after the maturity of the lease. What is a reasonable time in which the gas shall be marketed, and what amounts to the exercise of reasonable diligence in wildcat territory under all the circumstances, are questions of fact, and these have been settled by the court's findings against the appellant's contention.

[11] It is true that time is of the essence of oil and gas leases; that they are to be construed most strongly against the lessee, and that they are an exception to the rule that

equity abhors a forfeiture. Notwithstanding these rules, however, the lessor, by practical construction, by permitting the expenditure of large sums of money in development and by the acceptance of royalties, however small, by his subsequent conduct and especially by subsequent contract, may waive his right to declare a forfeiture. Washington v. Rosario Min. & Mill. Co., 28 Tex. Civ. App. 430, 67 S. W. 459; Benavides v. Hunt, 79 Tex. 383, 15 S. W. 396; Von Hatzfeld v. Haubert (Tex. Civ. App.) 224 S. W. 220.

[12] The record not only shows that Masterson, subsequent to the execution of his lease to the defendants for a valuable consideration, became a party to all they have done and failed to do with reference to development under the lease, but further shows that he and his son-in-law, Weymouth, who had charge of his oil interests, led the company to believe that it was not necessary to connect well No. 5 on the lease in question with the pipe line into Amarillo, because, as they stated, all the gas being marketed in Amarillo, was from other wells located elsewhere on Masterson's land. This is a practical construction to which the court must give great weight. It further appears that Masterson had received about $14,000 in royalties from the entire field in addition to gas which was being used by him in accordance with the contract for two of his ranchhouses, piped from well No. 5. Contracts are not construed so strongly against lessees under such conditions in wildcat territory, and do not require the payment of such large considerations to support them. Lone Star Gas Co. v. McCullough (Tex. Civ. App.) 220 S. W. 1114. It is held in Bost v. Biggers Bros. (Tex. Civ. App.) 222 S. W. 1112, that, in a suit to cancel an oil lease, where plaintiff contended that part of the consideration consisted of actual development of the land by lessee, it was not error to exclude testimony that the lessee was not financially able to put down a well on the land where it appeared that plaintiff fully understood lessee's financial condition at the time of the execution of the lease.

[13] For a stronger reason Masterson should not be heard to insist upon forfeiture in this case, according to a strict letter of his lease, where he subsequently becomes interested with the lessee in development. It is further shown that about $350,000 has been spent by Nobles and his associates and the corporation since its organization, and its assignees, in the development of the field, the greater part of this sum having been expended prior to the time Masterson served his notice of forfeiture; that a part of such sum was used in an effort to secure two different oil wells by deep tests near the lease in question, which resulted in dry holes. We think these facts sustain the court's finding that the appellees have used reasonable diligence in development and in their efforts to secure a market for the gas since it was discovered, and the further finding that gas has been discovered in paying quantities, resulting in the vesting of title.

[14, 15] The courts hold that the question of what amounts to oil and gas in paying quantities is a matter to be determined exclusively by the lessee acting in good faith. Texas & Pacific Coal & Oil Co. v. Bruce (Tex. Civ. App.) 233 S. W. 535. And it is held in Aycock v. Parafine Oil Co. (Tex. Civ. App.) 210 S. W. 851, that the words "in paying quantities" means that the quantity discovered must be sufficient to pay the lessee a profit, though small, over operating expenses, although it may never repay the cost of the well and its operation, and as a whole may result in a loss to the lessee. The trial judge found that well No. 5 was producing between 5,000,000 and 6,000,000 feet of gas daily, and held that to be a paying quantity.

[16] The holding that the well had not been abandoned is sustained by the evidence. Abandonment is generally a question of intention, and presents an issue of fact, and not of law.

[17] The failure of the appellees to pay the original nominal consideration has been waived by the appellant by the acceptance of subsequent rentals and by subsequent entry and development of the leases with his knowledge, consent, and acquiescence, and also by his execution of the supplemental lease which is in fact a recognition of the validity of the first (Von Hatzfeld v. Haubert [Tex. Civ. App.] 224 S. W. 220; McKay v. Tally [Tex. Civ. App.] 220 S. W. 167), especially where the drilling of a well to production, which is the real consideration, has been shown.

[18] After discovering gas in paying quantities the further obligation to drill for oil upon the leased premises, under all the circumstances, and in the light of the subsequent agreement, depends upon the question whether, in the use of reasonable diligence, they should have prospected for oil in another place or by a deeper test. After having found two dry holes near the land in question, whether the appellees should have prospected further is an issue of fact, which the trial court has decided against appellant. We would not be warranted in holding as a matter of law that such duty rested upon appellees.

[19] The judgment below contains this recital:

"It is further ordered, adjudged, and decreed that this judgment, denying plaintiff's claim for forfeiture and cancellation of the lease in controversy shall not be a bar to any future action for damages or specific performance."

This is the adjudication of a matter not presented by the pleadings, and which the trial judge had no right to determine. The appellant's future action with reference to

the subject-matter of the suit must be governed by conditions existing at the time and the nature of the suit filed. The judgment as entered, with this exception, is affirmed.

[20] Appellant has favored us with an exhaustive brief, citing a wealth of authorities bearing upon the various contentions urged here. On the other hand, appellees cite numerous decisions to the contrary, all of which serve to emphasize the hopeless conflicts which, it must be admitted, exist, not only between the decisions of the courts of various states, but even within the several states, and which we think useless for us to attempt to distinguish or reconcile in so far as the issues presented upon this appeal are concerned. It is true that the contract in this case does not convey the oil and gas "in place" as did the contract in Texas Co. v. Daugherty, 107 Tex. 226, 176 S. W. 717, L. R. A. 1917F, 989, and cannot, therefore, be held, in virtue of its terms, to convey an interest in the realty in the sense in which the Daugherty contract operated. But if the Daugherty Case decides anything it certainly declares that oil and gas in place are a part of the realty, and in again quoting with approval the case of Southern Oil Co. v. Colquitt, 28 Tex. Civ. App. 292, 69 S. W. 169, declares that it is such even to the extent that an attempted conveyance of them, apart from the homestead, is void unless the wife of the owner joins her husband in the instrument. This court held in Fisher v. Crescent Oil Co. (Tex. Civ. App.) 178 S. W. 905, that the lessee, by the drilling of a well within the term, has performed the conditions of the grant, and thereby vested the title in himself, subject to forfeiture for abandonment. The Supreme Court approved the holding of the Court of Civil Appeals in the case of Grubb v. McAfee, 109 Tex. 527, 212 S. W. 464, to the effect that the beginning of a well and its completion within the time limited for so doing vested the leasehold estate in the lessee for the full term. So whether we designate the contract in this case as a conveyance, a lease, an option, or a license, it seems to be settled in this state by the above-cited authorities and the following cases that the drilling of the well to production within the term of four years created at its completion an interest in the land. Munsey v. Marnet Oil & Gas Co. (Tex. Civ. App.) 199 S. W. 686; Benavides v. Hunt, supra; Starke v. J. M. Guffey Petroleum Co., 98 Tex. 542, 86 S. W. 1, 4 Ann. Cas. 1057; Gilmore v. O'Neal, 107 Tex. 18, 173 S. W. 203.

[21] The appellant's right to cancel appellees' vested interest, upon the condition that appellees have not, since discovery, and the expiration of the four-year term, complied with the obligations imposed upon them by the condition subsequent, is the real battleground of this contest. What amounts to a

compliance with such a condition in wildcat territory under all of the circumstances reflected by the record presents simply a question of fact. The unusual and peculiar circumstances here shown distinguish this case in its essential features from practically all of the authorities cited, and appeal to the equitable powers of the court with more force than those of any case we have found. Subsequent to the execution of the lease in question by Masterson, his act in becoming a party to the original purpose of the appellees, to lease a vast territory, and develop it as a whole, is the controlling issue, and the court having found that they have used reasonable diligence under all the circumstances is tantamount to a holding that they have complied with the conditions to such an extent as to create consideration supporting this particular lease. Leath v. Humble O. & R. Co. (Tex. Civ. App.) 223 S. W. 1022.

The judgment is affirmed.